FILED
DALLAS COUNTY
10/25/2019 4:25 PM
FELICIA PITRE
DISTRICT CLERK

Kayla Buckley

CAUSE NO. DC-19-17257

| | | |
|---|---|---|
| LATOYA K. PORTER | § | IN THE A-14TH |
| | § | |
| | § | |
| v. | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CITY OF DALLAS, DALLAS POLICE | § | |
| DEPARTMENT, CHIEF OF POLICE | § | |
| ULISHA RENEE HALL, MAJOR OF | § | |
| POLICE MICHAEL IGO | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, LaToya K. Porter, complains of the City of Dallas, Dallas Police Department, Chief of Police Ulisha Renee Hall, and Major of Police Michael Igo and alleges the following:

## I. PRELIMINARY STATEMENT

Ulisha Renee Hall ("Chief Hall"), the embattled Chief of the Dallas Police Department ("DPD"), wrongfully terminated, a 15-year veteran, LaToya Porter ("Major Porter" or "Plaintiff") in a truncated hearing that occurred on November 1, 2018. Major Porter was a bright and shining star of the DPD and in competition ultimately for the position of Chief. Major Porter's offense against mankind and the purported reason that she was wrongfully terminated was she was trying to assist others in their potential promotions to higher offices and combat internal injustices. Chief Hall committed many errors, not only in the hearing but in the manner in which she engaged in the process of the hearing. Imbued with insecurity and concerned about her position as head of the DPD, Chief Hall conspired with then-Lt. Michael Igo ("then-Lt. Igo"), an aggressively political officer of the DPD, and were grossly negligent in their duties and responsibilities.

Plaintiff was trouble and had to be eliminated, not only was she in competition with then-Lt. Igo for one of Chief Hall's top staff positions, she requested an investigation into the hostile work environment complaint she received at the North Central Division and an investigation into policy and procedural violations committed by the day shift personnel at the North Central Division. "Coincidentally," IOSolutions received an "anonymous tip" that Major Porter was engaged in wrongdoing. Ultimately, Chief Hall received this information and responded by immediately initiating an investigation of Plaintiff, appointing her lapdog, then-Lt. Igo, as the officer investigating Major Porter. Then-Lt. Igo was zealously motivated by the notion that he would be promoted to major, then become the new Chief of DPD.

Then-Lt. Igo put together a badly biased investigation report and lied to the Civil Service Board examining the issue of whether or not to proceed with the results of the Assessment Center portion of the sergeants' exam. Moreover, Chief Hall conducted a "termination hearing," that is well-named. She failed to thoroughly read the investigatory report. She had not talked to witnesses. She had not personally investigated the facts of the matter, including the volume of documents supporting Plaintiff. She chose instead to believe all Plaintiff's competitors, including the badly biased report of then-Lt. Igo. She then concluded the hearing as Plaintiff was in mid-sentence by saying that she had heard enough. Likewise, most if not all other commanders who were competing for a slot on Chief Hall's command staff were involved in Plaintiff's lynching. Because of Chief Hall and then-Lt. Igo's serious and numerous breaches of duty and other misconduct, LaToya Porter seeks redress herein.

PLAINTIFF'S ORIGINAL PETITION

## II. **STATEMENT OF FACTS**

1. On or about March 2004, Captain William Troy McClain was demoted from the Deputy Chief position to the Captain position for violations of the departmental policy.

2. On or about May 2013, as member of the command staff, Lieutenant Edwin Ruiz-Diaz was demoted from the Major position to the lieutenant position for drinking alcohol while in uniform.

3. On or about August 2015, as member of the command staff, Lieutenant Thomas Lawrence self-demoted from the Assistant Chief position back to the lieutenant position for calling a fellow female Chief a "bitch."

4. On or about October 2016, Major Porter was sitting in her office holding a Rubik's Cube. Deputy Chief Catrina Shead, (then-Chief Shead), was standing at the door talking to Major Porter when Deputy Chief Michael Coleman walked by (then-Chief Coleman), pointed to the Rubik's Cube and stated in a non-joking manner, "See, she intimidates me." At the time, then-Chief Coleman was Major Porter's direct supervisor.

5. On or about November 2016, then-Chief Coleman informed Major Porter that every email she sent to subordinates had to be approved by him before sending and no other majors had such an obligation.

6. On or about January 2017, as member of the command staff, Major Andrew Harvey self-demoted to the Lieutenant position amidst allegations of criminal/departmental policy violations.

7. On or about February 2017, then-Chief Coleman told Major Porter that he's not used to "women who think."

8. On or about April 2017, Major Porter submitted a Blue Team Request, which is the investigatory data entry system that the DPD uses to initiate investigations. The Blue Team request was submitted on Sergeant Geraldine White for policy violations. Assistant Chief of Police Paul Stokes ("then-Chief Stokes) never approved the investigation. While Major Porter was on Administrative Leave, then-Chief Stokes sent the Blue Team Request back to her, knowing that she was unable to investigate. The investigation was never conducted, much less completed.

9. On or about May 2017, then-Chief Stokes called Major Porter to a meeting and scolded her for submitting the Blue Team Request on Sergeant White. Major Porter informed then-Chief Stokes that she was following the policy regarding policy violations and initiating investigations. During this same meeting, Major Porter requested from then-Chief Stokes that he have a meeting with her and her supervisor, then-Chief Coleman, regarding her role as a Major at the South Central Division and then-Chief Coleman's treatment of her at that Division.

10. On or about June 5, 2017, then-Chief Coleman forwarded an e-mail to Major Porter and the personnel assigned to her that a subordinate would be in charge during his absence. Major Porter informed then-Chief Coleman that she would be in charge during his absence, and she requested another meeting with then-Chief Coleman's superiors.

11. On or about June 5, 2017, Deputy Chief Rick A. Watson ("Chief Watson"), was the Acting Assistant Chief for then-Chief Stokes, that day. Major Porter asked Chief Watson if he ever heard of a Lieutenant effectively overruling a Major. He didn't respond. According to the DPD General Orders Section 100, Majors would be acting Chiefs in the Deputy Chief's absence.

12. On or about June 6, 2017, Major Porter went on a scheduled vacation.

13. On or about June 13, 2017, Major Porter was contacted while she was in Minneapolis, Minnesota on departmental business at an Assessment Center for IOSolutions. She

was contacted by then-Chief Stokes who informed her that she was to be transferred the following day from the South Central Patrol Division to the North Central Patrol Division. The meeting that Major Porter requested with then-Chief Stokes and then-Chief Coleman regarding mistreatment and disrespect by then-Chief Coleman never took place.

14. On or about June 19, 2017, Major Porter arrived at the North Central Patrol Division where she met with Chief Watson, who informed her that he went directly to subordinates when he had questions or requests and that he would "try" to keep her in the loop.

15. On or about July 5, 2017, Major Porter adhered to the DPD outside employment policy and submitted a "Request for Outside Employment" form that was signed by Chief Watson and rejected by then-Chief Stokes because it was dated July 5, 2015.

16. On or about July 13, 2017, Major Porter re-submitted a "Request for Outside Employment" form that was signed by then-Chief Stokes and Chief Watson. During this same time period, Deputy Chief James Scott Walton, ("then-Chief Walton") requested volunteers to be subject matter experts for the DPD's upcoming Sergeant's exam.

17. On or about July 19, 2017, the City of Dallas announced Ulisha Renee Hall as the new Chief of Police.

18. On or about July 24, 2017, all Dallas Police commanders were required by Chief Hall to submit their resumes via email through the Personnel Division. Then- Chief Walton was the initial recipient of all of the command staff members' resumes. Major Porter included her outside business and the details of that business on her resume.

19. On or about July 25, 2017, then-Chief Walton requested that all commanders send him specifics regarding their role during the July 7, 2016 attack on police.

20. On or about September 6, 2017, Chief Hall started her first day as Chief of police in Dallas.

21. On or about September 2017, Chief Hall disrespected Chief Tammie Hughes ("then-Chief Hughes"), an African American female, in the Chief's command staff meeting. Then-Chief Hughes took Family and Medical Leave and never returned.

22. On or about September 22, 2017, Chief Watson took Family and Medical Leave and Major Porter became the acting Division commanders.

23. On or about October 12, 2017, Chief Hall announced that all command staff members would have to interview for limited positions. All commanders, including Major Porter, her colleagues and bosses were all vying for the same positions.

24. On or about October 2017, Chief Hall met with Assistant Chief of Police Christina Smith ("then-Chief Smith") an Anglo female who was under investigation, and gave her the option to retire or be terminated as member of the command staff.

25. On or about October 2017, Chief Hall verbally ordered Assistant Chief of Police Bridgette Gassaway ("then-Chief Gassaway"), an African American female, out of her office immediately. Then-Chief Gassaway took leave and never returned.

26. On or about October 15, 2017, Police Officer Latrice Madison ("Officer Madison") an African American female, contacted Major Porter regarding the hostile work environment she was experiencing the day shift, at the North Central Patrol Division on the day shift and requested to be transferred. Officer Madison stated: "they are racist." Officer Madison was the only female and African American who worked for Sgt. Gross. Major Porter contacted then-Chief Stokes regarding Officer Madison's complaint. Then-Chief Stokes instructed Major Porter to investigate Officer Madison's claims and report back to him.

27. On or about October 16, 2017, Major Porter met with Sgt. Adamek and Sgt. Gross regarding the allegations made by Officer Madison. According to Sgt. Gross and Officer Madison, Sgt. Gross met with Officer Madison alone on several occasions regarding violations of policy. Sgt. Gross did not have any documentation to reflect this nor had he mentioned it to his superior officers.

28. On or about October 17, 2017, Major Porter contacted then-Chief Stokes again and recommended that Officer Madison be transferred based on the conversations with Sgts. Adamek and Gross. He instructed Major Porter to further investigate the incident and suggested that Officer Madison be transferred to a different Sergeant at the same patrol Division. Major Porter informed then-Chief Stokes that all of the Sergeants were colleagues and merely moving Officer Madison would not remedy the situation, and would continue to place her in a hostile work environment.

29. On or about October 18, 2017, Major Porter met with other personnel who worked for Sgt. Gross. All were male. According to them, Sgt. Gross had not spoken to them about any infractions and only one them he met with alone as to the others, they stated to Major Porter that he never met with them alone.

30. On or about October 20, 2017, Major Porter emailed then-Chief Stokes reminding him that Officer Madison was scheduled to return to work on October 21, 2017, and based on her preliminary investigation findings, Officer Madison's request to be transferred should be granted. Then-Chief Stokes instructed Major Porter not to begin an investigation through the Internal Affairs Division.

31. On or about October 21, 2017, Officer Madison was finally transferred to the Central Division.

32. On or about October 23, 2017, Sgts. Gross and Adamek approached Major Porter about various police reports that had not been submitted by Officer Madison. Major Porter informed them that their actions seemed retaliatory since they failed to bring up the incomplete reports prior to Officer Madison's claim of a hostile work environment. In Major Porter then requested copies of reports and report numbers from every officer assigned to Sgt. Gross. Then-Chief Stokes contacted Major Porter regarding a complaint received through Chief Hall about the response time to a call. Then-Chief Stokes assigned Major Porter to investigate the complaint and she did so.

33. On or about November 9, 2017, Major Porter finally received the requested documentation, including report and gps records, for the days personnel from Sgt. Adamek. That same day, Major Porter e-mailed Chiefs Stokes and Watson about the results of the documentation and requested that an investigation be started on Sgt. Gross, Sgt. Adamek and all personnel assigned to the day shift for actionable misconduct. Regrettably, the investigation did not proceed as it should have.

34. Also, on October 23, 2017, Major Porter found out that Senior Corporal Ashlei O'Neal ("Senior Corporal O'Neal") was being denied admittance to the Assessment Center portion of the Sergeants' test. Major Porter accompanied Senior Corporal O'Neal to the City of Dallas Civil Service Department to discuss the denial. Major Porter also e-mailed Chief Hall and First Executive Assistant Chief of Police David Pughes ("Chief Pughes") about Senior Corporal Ashlei O'Neal being denied admittance to the Assessment Center after she tried to register on her City-issued cellphone.

35. On or about October 24, 2017 Major Porter interviewed for Chief Hall's new Command staff and was slated to become a Deputy Chief of Police.

36. On or about October 28, 2018, Major Porter reported to the North Central Patrol Division during her off time at approximately 6:30 a.m. Sgt. Gross showed to be on the schedule but was not present. Major Porter questioned the other Sergeants about Sgt. Gross's whereabouts. Finally, at approximately 8:20 a.m., the desk Sergeant stated that he just called to report that he was going to be absent for the day, which is a violation of the City of Dallas Personnel Rules, Dallas Police Department General Orders and Dallas Police Department Code Conduct which requires that he call in at a minimum an hour prior to his scheduled work time.

37. On or about October 30, 2017, Major Porter sent Chief Hall and then-Chief Stokes separate e-mails detailing the results of her investigation relating to a call she received from then-Chief Stokes regarding: 1) response times, 2) indifference towards work, 3) the culture of corruption that occurred at the North Central Patrol Division, and 4) time and accountability measures that needed to be outlined.

38. On that same day, October 30, 2017, Major Porter, with Sgt. Adamek, who was Sgt. Gross's supervisor at the time, instructed Sgt. Gross to find out what happened with Sgt. Gross showing on the detail but in fact was not present. Major Porter requested that Sgt. Adamek let her know what discipline would be administered.

39. On or about October 30, 2017, in response to Chief Hall's questions, Major Porter provided Chief Hall information on how she had been treated as a female and her experience as a major on the DPD command staff.

40. On October 30, 2017, at the behest of then-Chief Stokes, Major Porter initiated accountability measures for the North Central Division. Then-Chief Stokes insisted that Major Porter provide detailed information regarding the specific call that had been complained about.

41. Continuing on or about October 30, 2017, Major Porter requested documentation, including police reports and gps records, from Sgt. Adamek for personal days including logins and vehicle gps records.

42. On or about October 31, 2017, Chief Watson returned from Family and Medical Leave and reversed the accountability measures that Major Porter had implemented the day before.

43. Continuing on or about October 31, 2017, Sgt. DeMaagd began an investigation on Officer Madison, as approved by Chief Watson. Major Porter was unaware that Chief Watson approved this investigation.

44. On or about November 2, 2017, Major Porter e-mailed City of Dallas Civil Service personnel about the unfair treatment of another African American female, Senior Corporal Tramese Jones, regarding the Assessment Center. Senior Corporal Jones had been out on maternity leave, and when she returned to work, she was informed that she would have to take the Assessment Center portion of the Sergeants' exam at the same time as everyone else. All other Sergeant candidates received three months to prepare.

45. On or about November 7, 2017, Major Porter met with Assistant City Manager Ayeh Powers regarding her claim of a hostile work environment created by Officer Madison.

46. On or about November 7, 2017, Major Porter initiated a departmental request for control number investigation regarding the hostile work environment complaint made by Officer Madison against Sgt. Gross through the Internal Affairs Division.

47. On or about November 8, 2017, then-Chief Stokes; Major Griffith; Lt. Michael Igo; Lt. Irene Alanis; and Lt. Monique Alex circumvented the established investigatory process by inquiring into the make-up of the Rank and File Development Group, LLC.

48. On that same day, then-Chief Stokes called Major Porter into a meeting where he stated all Blue Team investigations must go through him. Continuing on or about November 8, 21017, Major Porter e-mailed Major Griffith and requested that he forward the Blue Team investigation that she initiated the night before to then-Chief Stokes. An investigation was initiated on that day against Major Porter by Lt. Alanis and approved by then-Chief Stokes.

49. On or about November 8, 2017, an investigation was initiated against Major Porter. This was initiated by Lt. Alanis and approved by then-Chief Stokes for Major Porter's involvement with the Rank & File Development Group, LLC, ("RFDG").

50. Again, on or about November 9, 2017, then-Chief Stokes received the Blue Team submission that Major Porter sent on November 7, 2017, from the Internal Affairs Division, but he never approved the investigation and it was subsequently considered a duplicate and merged with CN2017-239 the investigation initiated against Officer Latrice Madison , the equivalent the deletion.

51. Continuing on November 9, 2017, Major Porter heard a rumor that she was under investigation. Major Porter went to Major William Griffith's ("Major Griffith") office and asked to confirm whether she was under investigation. At the time, Major Griffith was the head of the Internal Affairs Division. Major Griffith stated in the presence of then-Lt. Igo that he was unable to say. Major Porter went to Major Fite who was the head of the Public Integrity Unit and asked to confirm whether she was under investigation. Major Fite stated, "not to my knowledge."

52. On November 14, 2017, Major Porter continued to hear rumors from departmental personnel that she was under investigation. Major Porter emailed Major Griffith, Chief Pughes, then-Chief Walton, Major Griffith and then-Lt. Igo, and inquired again about being under investigation. Her reason for multiple inquiries was due to the fact that other employees

were telling her that she was under investigation.  Then-Lt. Igo emailed Major Porter back and informed her that an Administrative Inquiry was being conducted and instructed her to report to the Internal Affairs Division and bring all business documents.

53. After being instructed to report to the DPD's Internal Affairs Division, Major Porter e-mailed Chief Hall and Mr. Taylor, Chief Hall's civilian Chief of Staff, and asked that any and all retaliation against her cease and that the investigation be quashed or conducted by a neutral third party.  Major Porter made this request because of Major Griffith's and then-Lt. Igo's initial hesitance to be forthcoming about her being under investigation and the hostile work environment that was created when Chief Hall announced that all commanders had to interview for a limited number of Command staff positions.  Major Griffith, Major Porter, and Major Reuben Ramirez ("Major Reuben Ramirez") were all Board members for the Sergeants' Assessment Center.  Then-Chief Stokes; Chief Walton; Chief Watson; Major Griffith; Major  Paulette Richardson ("then-Major Richardson"); and Major Ramirez had all applied and interviewed for the same command staff positions under Chief Hall during this time.  All parties involved in the investigation of Major Porter were competing for the same positions.

54. On November 15, 2017, Major Porter met with Mr. Taylor, and requested that the investigation be quashed or have a neutral third party conduct the investigation.  That did not happen.  Chief Hall never responded to Major Porter's request.

55. On or about November 17, 2017, Major Porter's due process was violated again by the Internal Affairs Division.  Major Porter was informed by an e-mail that an Administrative Inquiry was taking place.  When she appeared in person in the Internal Affairs Division on the 17th, the administrative inquiry had been changed to an administrative investigation, which is contrary to the DPD's Internal Affairs Division Standard Operating Procedure. Major Porter was

not presented with any allegations during this interview. The complaint presented was supposedly from an anonymous call. The policy stated that an investigation will not start merely on the basis of an anonymous phone call.

56. On November 22, 2017, Major Porter was subsequently placed on Administrative Leave before being presented with any allegations and without being given a reason.

57. On or about November 29, 2017, Chief Hall met with Major Porter and informed her that she would remain a Major on the command staff pending the outcome of the investigation.

58. Again, on November 29, 2017, Internal Affairs requested Major Porter appear for an interview wherein she was presented with allegations. She was told that her transcript would serve as her statement, although transcripts had not been used in years. Major Porter was recorded, and she was denied the right to prepare an internal statement, despite the fact that others were not denied the same process. She was told that her transcript would serve as her statement.

59. On November 30, 2017, Major Porter was removed from the departmental command staff records, including the organizational chart, only day after Chief Hall informed her that she would remain a part of the command staff.

60. On or about December 6, 2017, incredulously Chief Watson lied in his internal statement when he stated that he never had any conversations with Major Porter about her business. This makes no sense because if Chief Watson is to be believed, he would have to have signed off on Major Porter's DPD "Request for Outside Employment" form without asking any questions about the business. Then-Chief Stokes also approved by his signature Major Porter's participation in her outside business.

61. On or about December 2017, then-Chief Shead was demoted to the rank of major. then-Chief Shead was the only African American female Chief other than Chief Hall left on the command staff. Approximately a year later, Chief Walton gave Major Porter a lesser award than all other personnel same/similar work as she during the attack on police July 7, 2016, where several police officers were killed.

62. On January 24, 2018, finding of guilts were placed on Major Porter's Internal Affairs resume, in spite of the fact the investigation had not been completed until March 9, 2018.

63. On or about February 6, 2018, Chief Hall; Chief Pughes; Chief Walton; Major Ramirez; and then-Lt. Igo denied Major Porter due process again when neither she nor her attorney were given the chance to review the investigation or be notified that the information from the investigation would be presented in a Civil Service Board public hearing. Chief Walton stated in the hearing that the investigation is based on the preponderance of evidence. Then-Lt. Igo gave false and misleading statements during the Civil Service Board hearing, regarding Major Porter, and swayed the Board to vote for a new Sergeant Assessment Center. Then-Lt. Igo intentionally misled the Board into believing that they were unable to speak to the 12 clients of the RFDG. Further in the Civil Service Board hearing that took place on February 6, 2018, then-Lt. Igo admitted that he had no proof that Major Porter shared information as alleged.

64. On or about February 2018, Major Porter began Family and Medical Leave and was out until October 2018.

65. On or about February 7, 2018, then-Lt. Igo approached the District Attorney for the third time in an attempt to formulate a criminal investigation against Major Porter using the badly biased and inaccurate investigation, in spite of the fact the DPD Public Integrity Unit investigates criminal offenses, then-Lt. Igo persisted in pursuing this path.

66. On or about February 8, 2018, Major Porter requested permission to self-demote, which was approved by Chief's Watson and Anderson. In spite of their approval of the request and several other officers engaging in this practice in order to achieve due process of the law, Chief Hall denied Major Porter's request.

67. On or about February 10, 2018, Attorney Mr. Bickel sent certified letters detailing the facts surrounding the investigation of Major Porter, including Chief Hall; Mr. Taylor; City Manager TC Broadnax; Assistant City Manager John Fortune; Councilman Adam McGough; Assistant City Attorney Ayeh Powers; Interim Director/Civil Service Board Director; Pamela McDonald; Civil Service Director Michelle Hanchard; Civil Service Executive Assistant Anna Monzon; Civil Service Board Chair Anita M. Childress; Civil Service Broad Vice Chair Flora Hernandez; and Civil Service Board Member Chandra Marshall Henson.

68. On or about February 2018, Open Records requests were made by Mr. Bickel, Adam Villanueva, and Zac Horn for e-mails, copious notes, investigation, etc. which have not been released in over one (1) year. No Attorney General Exemption Letter was provided to either attorney. None of the exemptions are applicable to the request.

69. On or about February 20, 2018, Chief Hall made an announcement in the DPD's Personnel Division that Major Porter's was responsible for the re-taking of the Sergeants' Assessment Center; however, the investigation was not complete at that time, but regardless Chief Hall made that anyway.

70. On or about February 21, 2018, Mr. Bickel sent a cease and desist letter for Chief Hall to the City of Dallas through Ayeh Powers. Ayeh Powers, chief legal officer of the City of Dallas. Ms. Powers failed to respond to this request in writing to Mr. Bickel's request.

71. On or about March 6, 2018, Dallas Police Department Internal Affairs departmental documents show that the investigation was completed on this date.

72. On or about March 8, 2018, Major Porter was informed that Chief Hall denied her right to self-demote.

73. On or about March 9, 2018, then-Major Richardson was placed on Administrative Leave.  This action violated the precedent, in that, on information and belief, no one had ever been placed on Administrative Leave after an investigation was concluded.

74. On or about March 14, 2018, Major Porter sent Chief Hall a letter requesting the reason for the denial of her self-demotion and explaining its' unprecedented nature.  In spite of Chief Hall's claim of transparency on all important matters she completely failed to respond to this request.

75. On or about April 2018, Major Porter's attorneys were notified that the investigation was complete.

76. On or about August 2018, Chief Watson contacted Major Porter and requested that she meet with him to provide Doctor's notes.  Major Porter informed Chief Watson that she would follow the policy and provide required documentation upon her return. Major Porter did provide the required documentation to Major Ramirez at the request of Chief Watson upon her return in October of 2018.

77. On or about October 3, 2018, Major Porter was requested by Major Ramirez to complete her review and rebuttal of the investigation by approximately October 10, 2018, which had never happened before.

PLAINTIFF'S ORIGINAL PETITION

78. On or about October 8, 2018, Major Porter inquired into the investigation involving Sgt. Gross, Sgt. Adamek and the personnel on days at the North Central Patrol Division, but no such documentation could be found.

79. On or about October 10, 2018, Major Porter presented Major Ramirez with a formal complaint against then-Lt. Igo for false and misleading statements made during the hearing and in the investigation.

80. On or about October 24, 2018, Major Porter began an investigation through Blue Team on Chief Watson and then-Lt. Igo for false and misleading statements involving the investigation and followed up on the Blue Team entry by emailing Assistant Chief of Police Lonzo Anderson ("Chief Anderson").

81. On or about October 31, 2018, Major Porter requested disciplinary recommendations from Chief's Hall, Pughes, and Anderson. However, none provided the requested information.

82. On or about November 1, 2018, Chief Hall and her command staff held a termination hearing involving Major Porter, wherein Chief Hall interrupted Major Porter's answer to one of Chief Hall's questions and stated she had heard enough. Chief Hall violated Major Porter's due process when she failed to allow Major Porter to present all the evidence in her defense. The last time she cut her off, she ignored precedent by terminating Major Porter on the spot, violating the due process owed to public servants in being provided a full-post termination hearing and failing to consult her command staff. In spite of the signatures of then-Chief Stokes and Chief Watson approving Major Porter's business venture with the RFDG, Chief Hall announced her decision to terminate Major Porter and her 15 years of spotless record to the Dallas community as a police officer.

83. On or about November 1, 2018, Chief Hall implied in the hearing that she did not read the investigation involving Major Porter prior to terminating her.

84. As of November 2, 2018, there was a 100% reduction in Anglo female Chiefs, a 75% reduction in female Chiefs and 75% reduction of African American female Chiefs. Then-Chief Shead's demotion to Major, the promotion of Sharise Hadnot, and the firing of Majors Porter and Richardson caused a 33% percent reduction in African American female commanders.

85. On or about November 30, 2018, ex- Major Porter received an approval letter from the Texas Workforce Commission, stating that: "We can pay you benefits if you meet all other weekly requirements, such as being able and available to work, and actively searching for work." The Texas Workforce Commission further added the reason for decision statement, "Our investigation found that your employer fired you for a reason that was not misconduct connected with the work." Therefore, the DPD had to pay the bill.

86. Moreover, adding insult to injury on or about December 2018, ex-Major Porter received a document from the Texas Commission on Law Enforcement stating she received a general discharge, which has made it impossible to retain a position as a police officer.

87. When Chief Hall accepted the position in September of 2017, the following individuals were employed by the DPD:

Assistant Chief of Police Tammie Hughes (B/F) - left 09/2017 after being disrespected in a meeting;

Assistant Chief of Police Bridgette Gassaway (B/F) - left 10/2017 after being disrespected in the office;

Assistant Chief of Police Christina Smith (W/F) - left 10/2017 given the option to retire or be fired;

Major Angela Shaw (H/F) - promoted 12/2017;

Deputy Chief of Police Catrina Shead (B/F) - demoted 12/2017;

Major LaToya Porter (B/F) - terminated 11/2018;

Major Paulette Richardson (B/F) - terminated 11/2018;

Major Melissa McGee (W/F) - remained a Major 12/2018.

88. As of today, only three are still present. Five of the eight female commanders on this list were African American females and only one remains employed by the DPD.

## III. CLAIMS FOR WHICH PLAINTIFF SEEKS RELIEF

### A. Wrongful Termination and Abuse of Process

89. Plaintiff incorporates herein paragraphs 1 thru 88 above.

90. In spite of her elevated rank, Major Porter was not an at-will employee. The conduct on the Defendants' specifically, Plaintiff's employment was terminated because the DPD, through Chief Hall, discharged Plaintiff due to her race, color, gender, age, all of which are recognized as exceptions to at-will employment.

91. Moreover, notwithstanding the above, protected activity, Plaintiff will show she was retaliated against when she brought to the attention of competent governmental authorities the wrongdoing noted above in paragraphs 1 thru 89. Moreover, she was discriminated against in an employment sense due to her race, color, gender, age.

92. Chief Hall conducted the disciplinary hearing. It was a shame and intended only to give the appearance of fairness. Whereas in truth, there was no fairness whatsoever: in the middle of Major Porter's presentation she was interrupted several times and not allowed to

finish. Moreover, she was stopped in the middle of her presentation and told by Chief Hall that she had heard enough and that she was terminating Major Porter.

93. Major Porter was denied her due process rights to which she was entitled. For example, she was not permitted to have counsel present during the hearing. Major Porter asked and was denied this basic right. She was not allowed to cross-examine witnesses. Neither of her lawyers were allowed to participate in the proceedings. Her counsel were outside of the hearing. The only evidence of misconduct by Major Porter was the investigation report of then-Lt. Igo who never should have undertaken the writing and investigation necessary to render such a report.

94. Moreover, in spite of her elevated rank, Major Porter was not an at-will employee. The conduct on the Defendants' specifically, Plaintiff's employment was terminated because the DPD, through Chief Hall, discharged Plaintiff due to her race, color, gender, age, all of which are recognized as exceptions to at-will employment.

95. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**B. Whistleblower - Discharge of Public Employee**

96. Plaintiff incorporates herein paragraphs 1 thru 96 above.

97. Plaintiff rendered good-faith reports that several public employees violated the law. Plaintiff made a report to the appropriate chain of command at the DPD.

98. As a direct result her rendering of the requests for investigation, she was the subject of a sham investigation which resulted in her termination and suffered damages therefore.

99. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

## C. Retaliation

100. Plaintiff incorporates herein paragraphs 1 thru 100 above.

101. Plaintiff rendered a good-faith report that other public employees violated the law. Plaintiff made a report to the appropriate chain of command at the DPD. As a direct result thereof, inter alia Major Porter was retaliated against, terminated, and suffered the adverse personnel action.

102. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

## D. Abuse of Process

103. Plaintiff incorporates herein paragraphs 1 thru 103 above.

104. Plaintiff was served with a valid process. Defendants perverted the process when they used it as a way to terminate the Plaintiff. Plaintiff was in competition with certain individuals including other commanders of the DPD for a position on the command staff, including then-Lt. Igo who had ulterior motives, to promote. Chief Hall used the process to terminate the Plaintiff. Plaintiff suffered injury as a result of the improper use of process.

105. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

## E. Intentional Infliction of Emotional Distress

106. Plaintiff incorporates herein paragraphs 1 thru 106 above.

107. Chief Hall and then-Lt. Igo intended that they would inflict upon Major Porter emotional distress, ending her 15-year career and spotless record with the City of Dallas.

108. Plaintiff was in competition with certain individuals including other commanders of the DPD, for a position on the command staff, including then-Lt. Igo who had ulterior motives, to promote.

109. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**F. Negligence**

110. Plaintiff incorporates herein paragraphs 1 thru 110 above.

111. Defendants had a duty to act in a lawful way, which is not to conflate or misrepresent the facts. Plaintiff suffered damages as a result of the breach of duty, caused by the acts and practices of the Defendants.

112. By the conduct described herein above, Defendants were negligent and caused the injuries suffered by Major Porter.

113. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**F. Business Disparagement**

114. Plaintiff incorporates herein paragraphs 1 thru 114 above.

115. The Defendant published disparaging words about the RFDG, a limited liability company which Plaintiff owned half of the stock. The words published by the Defendants, specifically that RFDG provided confidential information to prospective sergeant candidates were false and were published with malice, because they wanted to harm RFDG so that the candidates would little or no assistance in preparing for the examination.

116. The Plaintiff pleads for special damages as well as damages in fact related to and caused by Defendants' illegal and improper conduct.

## IV. **DAMAGES**

117. The damages that LaToya Porter plead herein are as follows:

A.  Reinstatement to her rank of Major from November 1, 2018 to present;

B.  Back pay, and assuming no reinstatement, future pay;

C.  Damages to Plaintiff's reputation;

D.  Punitive damages, punitive because of the outrageous conduct of Chief Hall and then-Lt.

Igo;

E.  Lost benefits from November 1, 2018 to present;

F.  An injunction against future illegal conduct;

G.  Attorneys' fees;

H.  the cost of expert witnesses;

I.  and all other damages permitted by law.

## V. **PRAYER**

For the reasons here and above stated, Plaintiff asks the court to find that she has proved her claim and seeks the damages reflected above to include actual, special, and punitive damages as set forth above. Plaintiff seeks all other relief to which she is humbly entitled.

Respectfully submitted,


John W. Bickel II
Texas Bar #02292700

Bickel PLLC
3505 Milton Ave.
Dallas, TX 75205
(214) 537-8100
jwbickel@gmail.com
ATTORNEY FOR PLAINTIFF LATOYA PORTER

PLAINTIFF'S ORIGINAL PETITION