FILED
3/13/2020 1:25 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Gia Rodriguez DEPUTY

Case 3:20-cv-00999-G   Document 1-26   Filed 04/22/20   Page 1 of 43   PageID 113

CAUSE NO. DC-19-17257

| | | |
|---|---|---|
| LATOYA K. PORTER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| CITY OF DALLAS AND DALLAS | § | |
| POLICE DEPARTMENT | § | |
| | § | |
| Defendants. | § | 14TH JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, LaToya K. Porter, responds to the Defendant City of Dallas and Dallas Police Department's Supplemental Special Exceptions and alleges the following:

### I. PRELIMINARY STATEMENT

Ulisha Renee Hall ("Chief Hall"), the embattled Chief of the Dallas Police Department ("DPD"), wrongfully terminated, a fifteen-year veteran, LaToya Porter ("Major Porter" or "Plaintiff") in a truncated hearing that occurred on November 1, 2018. Major Porter was a bright and shining star of the DPD and in competition ultimately for the position of Chief. Major Porter's offense against mankind and the purported reason that she was wrongfully terminated was, in spite of her seeking and obtaining approval from her chain of command, she tried to assist others in their potential promotions to higher offices and combat internal injustices. Chief Hall committed many errors, not only in the hearing but in the manner in which she engaged in the process of the hearing. Imbued with insecurity and concerned about her position as head of

the DPD, Chief Hall conspired with Lt. Michael Igo ("then-Lt. Igo"), an aggressively political officer of the DPD, and were grossly negligent in their duties and responsibilities.

Plaintiff was trouble and had to be eliminated, not only was she in competition with then-Lt. Igo for one of Chief Hall's top staff positions, Major Porter requested an investigation into the hostile work environment complaint she received at the North Central Patrol Division and an administrative investigation into policy and procedural violations committed by the day shift personnel at the North Central Patrol Division. "Coincidentally," a vendor, IOSolutions, received an "anonymous tip" that Major Porter was engaged in wrongdoing. Ultimately, Chief Hall received this information and responded by immediately initiating an administrative investigation of Plaintiff, appointing her lapdog, then-Lt. Igo, as the officer investigating Major Porter. Then-Lt. Igo was zealously motivated by the notion that he would be promoted to major, then become the new Chief of DPD, but first he had to eliminate competition.

Then-Lt. Igo put together a badly biased administrative investigation report and lied to the Civil Service Board examining the issue of whether or not to proceed with the results of the assessment center portion of the sergeants' exam. Moreover, Chief Hall conducted a "termination hearing," that is well-named. Her mind was already made up. Chief failed to thoroughly read and review the investigative package. She had not talked to significant witnesses, including Assistant Chief of Police Paul Stokes ("then-Chief Stokes"). Chief Hall failed to personally investigate the facts of the matter, including the volume of documents and video evidence supporting Plaintiff. She chose instead to believe all Plaintiff's competitors, including the badly biased report of then-Lt. Igo. Chief Hall then concluded the hearing as Plaintiff was in mid-sentence by saying she had heard enough. Likewise, most if not all other commanders who were competing for a slot on Chief Hall's command staff, were involved in

Plaintiff's lynching. Because of Chief Hall and then-Lt. Igo's serious and numerous breaches of duty and other misconduct, LaToya Porter seeks redress herein.

## II. STATEMENT OF FACTS

1. On or about March 2004, Captain William Troy McClain was demoted from the Deputy Chief rank to the Captain rank for violations of departmental policy.

2. On or about May 2013, as member of the command staff, Lieutenant Edwin Ruiz-Diaz was demoted from the Major rank to the lieutenant rank for drinking alcohol while in uniform.

3. On or about August 2015, as member of the command staff, Lieutenant Thomas Lawrence self-demoted from the Assistant Chief rank back to the lieutenant rank for calling a fellow female Chief a "bitch."

4. On or about October 2016, Major Porter was sitting in her office holding a Rubik's Cube. Deputy Chief Catrina Shead, (then-Chief Shead), was standing at the door talking to Major Porter when Deputy Chief Michael Coleman walked by (then-Chief Coleman), pointed to the Rubik's Cube and stated in a non-joking manner, "See, she intimidates me." At the time, then-Chief Coleman was Major Porter's direct supervisor.

5. On or about November 2016, then-Chief Coleman informed Major Porter that every email she sent to subordinates had to be approved by him before sending and no other majors had such an obligation.

6. On or about January 2017, as a member of the command staff, Major Andrew Harvey self-demoted to the lieutenant rank amidst allegations of criminal/departmental policy violations.

7. On or about February 2017, then-Chief Coleman told Major Porter that he's not used to "women who think."

8. On or about April 2017, Major Porter submitted a Blue Team Request, which is the investigatory data entry system that the DPD uses to initiate administrative investigations. The Blue Team request was submitted on Sergeant Geraldine White for policy violations. Then-Chief Stokes never approved the administrative investigation. While Major Porter was on Administrative Leave, then-Chief Stokes sent the Blue Team request back to her, knowing that she was unable to investigate. The administrative investigation was never conducted, much less completed.

9. On or about May 2017, then-Chief Stokes called Major Porter to a meeting and scolded her for submitting the Blue Team Request on Sergeant White. Major Porter informed then-Chief Stokes that she was following the policy regarding violations and initiating administrative investigations. During this same meeting, Major Porter requested from then-Chief Stokes that he have a meeting with her and her supervisor, then-Chief Coleman, regarding her role as a Major at the South Central Division and then-Chief Coleman's treatment of her at that Division.

10. On or about June 5, 2017, then-Chief Coleman forwarded an e-mail to Major Porter and the personnel assigned to her informing them all that a subordinate would be in charge during his absence. Major Porter informed then-Chief Coleman that consistent with long-standing department policy she would be in charge during his absence. She requested another meeting with then-Chief Coleman's superiors. That meeting did not occur.

11. On or about June 5, 2017, Deputy Chief Rick A. Watson ("Chief Watson"), was the Acting Assistant Chief for then-Chief Stokes, that day. Major Porter asked Chief

Watson if he ever heard of a lieutenant effectively overruling a Major. Chief Watson did not respond. According to the DPD General Orders Section 103.01, "a Major will report directly to the Deputy Chief and will serve as the Division Commander in the absence of the Deputy Chief."

12. On or about June 7, 2017, Major Porter went on a scheduled vacation.

13. On or about June 13, 2017, Major Porter was contacted by then-Chief Stokes while she was in Minneapolis, Minnesota on departmental business participating with an assessment center for IOSolutions. IOSolutions is a private corporate entity contracted through the City of Dallas to handle the assessment center portion of the DPD promotional process. Then-Chief Stokes informed Major Porter that she was to be transferred the following day from the South Central Patrol Division to the North Central Patrol Division. The meeting that Major Porter requested with then-Chief Stokes and then-Chief Coleman regarding mistreatment and disrespect by then-Chief Coleman never took place.

14. On or about June 19, 2017, Major Porter arrived at the North Central Patrol Division where she met with Chief Watson. During that meeting, Chief Watson informed Major Porter rather than following the standard communication protocols, he would go directly to subordinates when he had questions or requests. Furthermore, Chief Watson stated that he would "try" to keep her in the loop.

15. On or about July 5, 2017, Major Porter adhered to the DPD outside employment policy and submitted a "Request for Outside Employment" form that was signed by Chief Watson and rejected by then-Chief Stokes because it was dated July 5, 2015.

16. On or about July 13, 2017, Major Porter re-submitted a "Request for Outside Employment" form that was signed by both then-Chief Stokes and Chief Watson. During this

same time period, Deputy Chief James Scott Walton, ("then-Chief Walton") requested volunteers to be subject matter experts for the DPD's upcoming Sergeant's exam.

17. On or about July 19, 2017, the City of Dallas announced Ulisha Renee Hall as the new Chief of Police.

18. On or about July 24, 2017, all Dallas Police commanders were required by Chief Hall to submit their resumés via email through the Personnel Division.  Then-Chief Walton was the initial recipient of all of the command staff members' resumés.  Major Porter included her outside business and the details of that business on her resumé.

19. On or about July 25, 2017, then-Chief Walton requested that all commanders send him specifics regarding their roles during the July 7, 2016 attack on the DPD police officers.

20. On or about September 6, 2017, Chief Hall started her tenure as Chief of police in Dallas.

21. On or about September 2017, Chief Hall disrespected Assistant Chief Tammie Hughes ("then-Chief Hughes"), an African-American female, by belittling her in the Chief's command staff meeting.  Then-Chief Hughes took Family and Medical Leave, never returned, and ultimately retired after more than three decades of service.

22. On or about September 22, 2017, Chief Watson took Family and Medical Leave and Major Porter became the Acting Deputy Chief of Police, service as the division commander of the North Central Patrol Division.

23. On or about October 12, 2017, Chief Hall announced that all command staff members would have to interview for limited positions.  All commanders, including Major Porter, her colleagues, and bosses (other ranking officers) were all vying for the same positions.

24. On or about October 2017, Chief Hall met with Assistant Chief of Police Christina Smith ("then-Chief Smith") Caucasian female who was under administrative investigation. Chief Hall gave Chief Smith the option to retire or be terminated as a member of the command staff. Chief Smith chose to retire.

25. On or about October 2017, Chief Hall verbally ordered Assistant Chief of Police Bridgette Gassaway ("then-Chief Gassaway"), an African-American female, out of her office immediately. Then-Chief Gassaway took leave, never returned, ultimately retired after more than three decades of service.

26. On or about October 15, 2017, Police Officer Latrice Madison ("Officer Madison") an African-American female, contacted Major Porter regarding the hostile work environment she was experiencing on the day shift, at the North Central Patrol Division and requested to be transferred. Officer Madison stated: "they are racist." Officer Madison was the only female and African-American who worked for Sgt. Stephen Gross ("Sgt. Gross"). Major Porter contacted then-Chief Stokes regarding Officer Madison's complaint. In accordance with City and Department policy, then-Chief Stokes instructed Major Porter to investigate Officer Madison's claims and report back to him.

27. On or about October 16, 2017, Major Porter met with Sgt. Michael Adamek ("Sgt. Adamek") and Sgt. Gross regarding the allegations made by Officer Madison. According to Sgt. Gross and Officer Madison, Sgt. Gross met with Officer Madison alone on several occasions regarding violations of "policy." Inconsistent with Department policy, Sgt. Gross did not have any documentation to reflect this nor had he mentioned it to his superior officers.

28. On or about October 17, 2017, Major Porter contacted then-Chief Stokes again and recommended that Officer Madison be transferred based on the conversations with

Sgts. Adamek and Gross.  Then-Chief Stokes instructed Major Porter to further investigate the incident and suggested that Officer Madison be transferred to a different sergeant at the same patrol division.   Major Porter informed then-Chief Stokes that all of the sergeants were colleagues and merely moving Officer Madison would not remedy the situation, and would continue to place her in a hostile work environment.

29. On or about October 18, 2017, Major Porter met with other personnel who worked for Sgt. Gross. All were male.  According to these male officers, Sgt. Gross had not spoken to them about any infractions and only one of them he met with alone as to the others, they stated to Major Porter that he never met with them alone.

30. On or about October 20, 2017, Major Porter emailed then-Chief Stokes reminding him that Officer Madison was scheduled to return to work on October 21, 2017, and based on her preliminary administrative investigation findings, Officer Madison's request to be transferred should be granted.  Then-Chief Stokes instructed Major Porter not to begin an administrative investigation through the Internal Affairs Division.

31. On or about October 21, 2017, Officer Madison was finally transferred to the Central Division.

32. On or about October 23, 2017, Sgts. Gross and Adamek approached Major Porter about various police reports that had not been submitted by Officer Madison.  Major Porter informed them that their actions seemed retaliatory since they failed to bring up the incomplete reports prior to Officer Madison's claim of a hostile work environment.  Major Porter then requested copies of reports and report numbers from every officer assigned to Sgt. Gross. Then-Chief Stokes contacted Major Porter regarding a complaint received through Chief Hall

about the response time to a call. Then-Chief Stokes assigned Major Porter to investigate the complaint and she did so.

33. On or about November 9, 2017, Major Porter finally received the requested documentation, including report and GPS records, for the days personnel from Sgt. Adamek. That same day, Major Porter e-mailed then-Chief Stokes and Chief Watson about the results of the documentation and requested that an administrative investigation be started on Sgt. Gross, Sgt. Adamek, and all personnel assigned to the day shift for actionable misconduct. Regrettably, the administrative investigation did not proceed as it should have.

34. Also, on October 23, 2017, Major Porter found out that the City of Dallas Civil Service test administrators denied Senior Corporal Ashlei O'Neal ("Senior Corporal O'Neal") admittance to the assessment center portion of the sergeants' test. Major Porter accompanied Senior Corporal O'Neal to the City of Dallas Civil Service Department to discuss the denial. Major Porter also e-mailed Chief Hall and First Executive Assistant Chief of Police David Pughes ("Chief Pughes") about Senior Corporal Ashlei O'Neal's denial of admittance to the assessment center after she tried to register on her City-issued cellphone.

35. On or about October 24, 2017 Major Porter interviewed for Chief Hall's new Command staff and was slated to become a Deputy Chief of Police.

36. On or about October 28, 2017, Major Porter reported to the North Central Patrol Division during her non-duty time at approximately 6:30 a.m. Sgt. Gross appeared on the work schedule but was not present. Major Porter questioned the other sergeants about Sgt. Gross's whereabouts. Finally, at approximately 8:20 a.m., the desk sergeant stated that Sgt. Gross had just called to report that he was going to be absent for the day, which is a violation of the City of Dallas Personnel Rules, Dallas Police Department General Orders, and Dallas Police

Department Code Conduct which requires that DPD employees call in at a minimum one hour prior to scheduled work time.

37. On or about October 30, 2017, Major Porter sent Chief Hall and then-Chief Stokes separate e-mails detailing the results of her administrative investigation relating to a call she received from then-Chief Stokes regarding: (1) response times; (2) indifference towards work; (3) and the culture of corruption that occurred at the North Central Patrol Division, and 4) time and accountability measures that needed to be outlined.

38. On that same day, October 30, 2017, Major Porter met with Sgt. Adamek, who was Sgt. Gross's supervisor at the time, instructed Sgt. Adamek to find out what happened with Sgt. Gross showing on the detail but in fact was not present. Major Porter requested that Sgt. Adamek let her know what discipline would be administered.

39. On or about October 30, 2017, in response to Chief Hall's questions, Major Porter provided Chief Hall information on how she had been treated as a female and her experience as a major on the DPD command staff.

40. On October 30, 2017, at the behest of then-Chief Stokes, Major Porter initiated accountability measures for the North Central Patrol Division. Then-Chief Stokes insisted that Major Porter provide detailed information regarding the specific call that had been complained about.

41. Continuing on or about October 30, 2017, Major Porter requested documentation, including police reports and GPS records, from Sgt. Adamek for personal days including logins and vehicle GPS records.

10          PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

42. On or about October 31, 2017, Chief Watson returned from Family and Medical Leave and reversed the accountability measures that Major Porter had implemented the day before at the North Central Patrol Division.

43. Continuing on or about October 31, 2017, Sgt. DeMaagd began an administrative investigation on Officer Madison, as approved by Chief Watson. Major Porter was not informed that Chief Watson approved this administrative investigation.

44. On or about November 2, 2017, Major Porter e-mailed City of Dallas Civil Service personnel about the unfair treatment of another African-American female, Senior Corporal Tramese Jones, regarding the assessment center. Senior Corporal Jones had been out on maternity leave, and when she returned to work, she was informed that she would have to take the assessment center portion of the sergeants' exam at the same time as everyone else. All other sergeant candidates received three months to prepare.

45. On or about November 7, 2017, Major Porter met with Assistant City Attorney Ayeh Powers regarding Officer Madison's hostile work environment claim.

46. On or about November 7, 2017, Major Porter initiated a departmental request for control number administrative investigation regarding the hostile work environment complaint made by Officer Madison against Sgt. Gross through the Internal Affairs Division.

47. On or about November 8, 2017, then-Chief Stokes; Major Griffith ("then-Major Griffith"), Lt. Michael Igo ("then-Lt. Igo"), Lt. Irene Alanis, and Lt. Monique Alex (then-Lt. Alex) circumvented the established investigatory process by inquiring into the make-up of the Rank and File Development Group, LLC ("RFDG"), a private corporation partially owned by Major Porter.

48. On that same day, then-Chief Stokes called Major Porter into a meeting where he stated all Blue Team administrative investigations must go through him and she needed to send administrative investigations to him for approval. Continuing on or about November 8, 2017, Major Porter e-mailed then-Major Griffith and requested that he forward the Blue Team administrative investigation that she initiated the night before to then-Chief Stokes. An administrative investigation was initiated on that day against Major Porter by Lt. Alanis and approved by then-Chief Stokes.

49. On or about November 8, 2017, an administrative investigation was initiated against Major Porter. This was initiated by Lt. Alanis and approved by then-Chief Stokes for Major Porter's involvement with the RFDG.

50. Again, on or about November 9, 2017, then-Chief Stokes received the Blue Team submission for a hostile work environment that Major Porter submitted on November 7, 2017, from the Internal Affairs Division, but then-Chief Stokes never approved the hostile work environment administrative investigation. The hostile work environment Blue Team submission was not investigated, instead the submission was subsequently considered a duplicate and merged with CN2017-239 the administrative investigation initiated against Officer Latrice Madison, the equivalent of deletion.

51. Continuing on November 9, 2017, Major Porter heard a rumor that she was under administrative investigation. Major Porter went to then-Major Griffith's office and asked to confirm whether she was under administrative investigation. At the time, then-Major Griffith was the head of the Internal Affairs Division. Then-Major Griffith stated in the presence of then-Lt. Igo that he was unable to say. Major Porter went to Major Fite who was the head of the

Public Integrity Unit and asked to confirm whether she was under administrative investigation. Major Fite stated, "not to my knowledge."

52. On November 14, 2017, Major Porter continued to hear rumors from departmental personnel that she was under administrative investigation. Major Porter emailed then-Major Griffith, Chief Pughes, then-Chief Walton, then-Major Griffith and then-Lt. Igo, and inquired again about being under administrative investigation. Her reason for multiple inquiries was due to the fact that other employees were telling her that she was under administrative investigation. Then-Lt. Igo emailed Major Porter back and informed her that an "administrative inquiry" was being conducted and instructed her to report to the Internal Affairs Division and bring all business documents related to RFDG used to train the DPD personnel.

53. After being instructed to report to the DPD's Internal Affairs Division, Major Porter e-mailed Chief Hall and Mr. Taylor, Chief Hall's civilian Chief of Staff, and asked that any and all retaliation against her cease and that the administrative investigation be quashed or conducted by a neutral third party. Major Porter made this request because of then-Major Griffith's and then-Lt. Igo's initial hesitance to be forthcoming about her being under administrative investigation and the hostile work environment that was created when Chief Hall announced that all commanders had to interview for a limited number of command staff positions. Major Griffith, Major Porter, and Major Reuben Ramirez ("then-Major Ramirez") were all board members for the sergeants' assessment center. Then-Chief Stokes, Chief Walton, Chief Watson, Major Griffith, Major Paulette Richardson ("then-Major Richardson"), and Major Ramirez had all applied and interviewed for the same command staff positions under Chief Hall during this time. All parties involved in the administrative investigation of Major Porter were competing for the same positions.

54. On November 15, 2017, Major Porter met with Mr. Taylor, and requested that the administrative investigation be quashed or have a neutral third party conduct the administrative investigation. That did not happen. Chief Hall never responded to Major Porter's request.

55. On or about November 17, 2017, Major Porter's due process rights were violated again by the Internal Affairs Division. Major Porter was informed by an e-mail that an Administrative inquiry was taking place. When she appeared in person in the Internal Affairs Division on the 17th, the administrative inquiry had been changed to an administrative investigation, which is contrary to the DPD's Internal Affairs Division Standard Operating Procedure. Major Porter was not presented with any allegations during this interview. The complaint as presented, was supposedly from an anonymous call. The DPD General Orders Employee Rights Section 506.01 states, "No formal administrative investigation may be initiated solely on the basis of an anonymous complaint."

56. On November 22, 2017, Major Porter was subsequently placed on Administrative Leave before being presented with any allegations and without being given a reason.

57. On or about November 29, 2017, in a post-promotional interview with Chief Hall, Chief Hall informed Major Porter that she would remain a Major on the command staff pending the outcome of the administrative investigation.

58. Again, on November 29, 2017, Internal Affairs requested Major Porter appear for an interview wherein she was presented with allegations. Major Porter was told that the transcription from the audio-recorded interviews would serve as her statement, although transcripts had not been used in years. Transcripts of audio-recorded statements are not routinely

used in the DPD Internal Affairs administrative investigation process. Major Porter was recorded, and she was initially denied the right to prepare an internal statement, despite Major Porter's repeated request to make a written statement.

59. On November 30, 2017, Major Porter was removed from the departmental command staff records, including the organizational chart, only one day after Chief Hall informed her that she would remain a part of the command staff.

60. On or about December 6, 2017, incredulously Chief Watson lied in his internal statement when he stated that he never had any conversations with Major Porter about her business. This makes no sense because if Chief Watson is to be believed, he would have to have signed off on Major Porter's DPD "Request for Outside Employment" form without asking any questions about the business. Then-Chief Stokes also approved by his signature Major Porter's participation in her outside business.

61. On or about December 2017, then-Chief Shead was demoted to the rank of major. Then-Chief Shead was the only African-American female Chief other than Chief Hall left on the command staff.

62. On or about March 2017, Major Porter found an award commending her for her performance during the fatal attack on Dallas Police July 7, 2016. Major Porter was not informed that she was receiving the award and later learned those of her subordinates that performed that same or similar duties during that time received an award of higher stature.

63. On January 24, 2018, findings of guilt were placed on Major Porter's Internal Affairs resumé, in spite of the fact the administrative investigation had not been completed until March 9, 2018.

64. On or about February 6, 2018, Chief Hall, Chief Pughes, then-Chief Walton, then-Major Ramirez, and then-Lt. Igo denied Major Porter due process again when neither she nor her attorney were given the opportunity to review the administrative investigation or be notified that the information from the administrative investigation would be presented in a City of Dallas Civil Service Board public hearing. Chief Walton stated in the hearing that the administrative investigation is based on the preponderance of evidence. Then-Lt. Igo gave false and misleading statements during the City of Dallas Civil Service Board hearing, regarding Major Porter, and swayed the board to vote for a new sergeant assessment center. Then-Lt. Igo intentionally misled the board into believing that they were unable to speak to the twelve clients of the RFDG. Further in the Civil Service Board hearing that took place on February 6, 2018, then-Lt. Igo admitted that he had no proof that Major Porter shared information as alleged.

65. On or about February 2018, Major Porter began Family and Medical Leave and was out until October 2018.

66. On or about February 7, 2018, then-Lt. Igo approached the District Attorney for the third time in an attempt to formulate a criminal administrative investigation against Major Porter using the badly biased and inaccurate administrative investigation, in spite of the fact the DPD Public Integrity Unit investigates criminal offenses, then-Lt. Igo persisted in pursuing this path.

67. On or about February 8, 2018, Major Porter requested permission to self-demote, which was approved by Chief's Watson and Anderson. Ranks below the rank of Major are covered under the umbrella of the City of Dallas Civil Service rules and would have provided Major Porter an alternative to plead her case before an administrative judge. In spite of their

approval of the request and several other officers engaging in this practice in order to achieve due process of the law, Chief Hall denied Major Porter's request.

68. On or about February 10, 2018, Attorney Mr. Bickel sent certified letters detailing the facts surrounding the administrative investigation of Major Porter, including Chief Hall; Mr. Taylor; City Manager TC Broadnax; Assistant City Manager John Fortune; Councilman Adam McGough; Assistant City Attorney Ayeh Powers; Interim Director/Civil Service Board Director; Pamela McDonald; Civil Service Director Michelle Hanchard; Civil Service Executive Assistant Anna Monzon; Civil Service Board Chair Anita M. Childress; Civil Service Broad Vice Chair Flora Hernandez; and Civil Service Board Member Chandra Marshall Henson.

69. On or about February 2018, Open Records requests were made by Mr. Bickel, Adam Villanueva, and Zac Horn for e-mails, copious notes, administrative investigation, etc. which have not been released in over one (1) year. No Attorney General Exemption Letter was provided to either attorney. None of the exemptions are applicable to the request.

70. On or about February 20, 2018, Chief Hall made an announcement in the DPD's Personnel Division that Major Porter was responsible for the re-taking of the sergeants' assessment center; however, the administrative investigation was not complete at that time, but regardless Chief Hall made that statement anyway.

71. On or about February 21, 2018, Mr. Bickel sent a cease and desist letter for Chief Hall to the City of Dallas through Ayeh Powers. Ayeh Powers, chief legal officer of the City of Dallas, failed to respond to this request in writing to Mr. Bickel's request.

72. On or about March 6, 2018, Dallas Police Department Internal Affairs documents reflect that the administrative investigation was completed on this date.

73. On or about March 8, 2018, Major Porter was informed that Chief Hall denied her request to self-demote.

74. On or about March 9, 2018, then-Major Richardson was placed on Administrative Leave. This action violated the precedent, in that, on information and belief, no one had ever been placed on Administrative Leave after an administrative investigation was concluded.

75. On or about March 14, 2018, Major Porter sent Chief Hall a letter requesting the reason for the denial of her self-demotion and explaining its' unprecedented nature. In spite of Chief Hall's claim of transparency on all important matters she completely failed to respond to this request.

76. On or about April 2018, Major Porter's attorneys were notified that the administrative investigation was complete.

77. On or about August 2018, Chief Watson contacted Major Porter and requested that she meet with him to provide doctor's notes. Major Porter informed Chief Watson that she would follow the policy and provide required documentation upon her return. Major Porter did provide the required documentation to then-Major Ramirez at the request of Chief Watson upon her return in October of 2018.

78. On or about October 3, 2018, Major Porter was requested by then-Major Ramirez to given a due date complete her review and rebuttal of the administrative investigation by approximately October 10, 2018, which is unprecedented.

79. On or about October 8, 2018, Major Porter inquired into the administrative investigation involving Sgt. Gross, Sgt. Adamek and the personnel on days at the North Central Patrol Division, but no such documentation could be found.

80. On or about October 10, 2018, Major Porter presented then-Major Ramirez with a formal complaint against then-Lt. Igo for false and misleading statements made during the hearing and in the administrative investigation.

81. On or about October 24, 2018, Major Porter began an administrative investigation through Blue Team on Chief Watson and then-Lt. Igo for false and misleading statements involving the administrative investigation and followed up on the Blue Team entry by emailing Assistant Chief of Police Lonzo Anderson ("Chief Anderson").

82. On or about October 31, 2018, Major Porter requested disciplinary recommendations from Chiefs Hall, Pughes, and Anderson. None of these command officers provided the requested information.

83. On or about November 1, 2018, Chief Hall and her command staff held a termination hearing involving Major Porter, wherein Chief Hall interrupted Major Porter's answer to one of Chief Hall's questions by stating she had heard enough. Chief Hall violated Major Porter's due process when she failed to allow Major Porter to present all the evidence in her defense. The last time Chief Hall cut Major Porter off, Chief Hall ignored well-established precedent by terminating Major Porter on the spot. Chief Hall's actions violated Major Porter's due process rights as owed to her as a tenured public servant in Chief Hall's failure to provide a full-post termination hearing as required by law. In spite of the signatures of then-Chief Stokes and Chief Watson approving Major Porter's business venture with the RFDG, Chief Hall announced her decision to terminate Major Porter thus obliterating Major Porter's fifteen-years of exemplary service to the Dallas community.

84. On or about November 1, 2018, Chief Hall implied in the hearing that she did not read the administrative investigation involving Major Porter prior to terminating her.

85. As of November 2, 2018, there was a 100% reduction in the number of Caucasian female Chiefs, a 75% reduction in female Chiefs, and 75% reduction of African-American female Chiefs. Major Eno Fite self-demoted. Then- Chief Shead's demotion to Major, the promotion of Sharise Hadnot, and the firing of Majors Porter and Richardson caused a 33% percent reduction in African-American female Majors.

86. On or about November 30, 2018, former-Major Porter received an approval letter from the Texas Workforce Commission, stating that: "We can pay you benefits if you meet all other weekly requirements, such as being able and available to work, and actively searching for work." The Texas Workforce Commission further added the reason for decision statement, "Our administrative investigation found that your employer fired you for a reason that was not misconduct connected with the work." Therefore, the DPD had to pay the bill.

87. Moreover, adding insult to injury on or about December 2018, ex-Major Porter received a document from the Texas Commission on Law Enforcement stating she received a general discharge, which has made it impossible to obtain employment police officer.

88. When Chief Hall began her tenure with the DPD in September of 2017, the following females were employed by the DPD and were soon subjected to adverse employment actions:

(1) Assistant Chief of Police Tammie Hughes (AA/F) - left 09/2017 after being disrespected in a meeting;

(2) Assistant Chief of Police Bridgette Gassaway (AA/F) - left 10/2017 after being disrespected in the office;

(3) Assistant Chief of Police Christina Smith (C/F) - retired 10/2017 given the option to retire or be fired;

(4) Major LaToya Porter (AA/F) - terminated 11/2018;

(5) Major Paulette Richardson (AA/F) - terminated 11/2018;

As of 12/2018 the following female commanders remain.

(6) Deputy Chief of Police Catrina Shead (AA/F) - demoted 12/2017

(7) Major Angela Shaw (H/F) - promoted 12/2017;

(8) Major Melissa McGee (C/F) - remained a Major 12/2018.

(9) Major Janet Page (C/F) - remained a Major 12/2018

89. As of today, only three are still present. Five of the eight female commanders on this list were African American females and only one remains employed by the DPD.

## III. CLAIMS FOR WHICH PLAINTIFF SEEKS RELIEF

### A. Wrongful Termination and Abuse of Process

90. Plaintiff incorporates herein paragraphs 1 thru 89 above.

91. In spite of her elevated rank, Major Porter was not an at-will employee. The conduct on the Defendants' specifically, Plaintiff's employment was terminated because the DPD, through Chief Hall, discharged Plaintiff due to her race, color, gender, age, all of which are recognized as exceptions to at-will employment.

92. Moreover, notwithstanding the above, protected class status, Plaintiff will show she was retaliated against when she brought to the attention of competent governmental authorities the wrongdoing noted above in paragraphs 1 thru 89. Moreover, she was discriminated against in an employment sense due to her race, color, gender, age.

93. Chief Hall conducted the disciplinary hearing. It was a sham process intended only to give the appearance of fairness. Whereas in truth, there was no fairness whatsoever: in the middle of Major Porter's presentation she was interrupted several times and

not allowed to finish presenting information essential for her own defense. Moreover, she was stopped in the middle of her presentation and told by Chief Hall that she had heard enough and that she was terminating Major Porter.

94. Major Porter was denied her due process rights to which she was entitled. For example, she was not permitted to have counsel present during the hearing. Major Porter asked and was denied this basic right. She was not allowed to cross-examine witnesses. Neither of her lawyers were allowed to participate in the proceedings. Her counsel were outside of the hearing room. The only evidence of misconduct by Major Porter was the administrative investigation report of then-Lt. Igo who never should have undertaken the writing and administrative investigation necessary to render such a report.

95. Moreover, in spite of her elevated rank, Major Porter was not an at-will employee. The conduct on the Defendants' specifically, Plaintiff's employment was terminated because the DPD, through Chief Hall, discharged Plaintiff due to her race, color, gender, age, all of which are recognized as exceptions to at-will employment.

96. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**B. Whistleblower - Discharge of Public Employee**

97. Plaintiff incorporates herein paragraphs 1 thru 96 above.

98. Plaintiff rendered good-faith reports that several public employees violated the law. Plaintiff made a report to the appropriate chain of command at the DPD.

99. As a direct result her rendering of the requests for administrative investigation, she was the subject of a sham administrative investigation which resulted in her termination and suffered damages, therefore.

100. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

## C. Retaliation

101. Plaintiff incorporates herein paragraphs 1 thru 100 above.

102. Plaintiff rendered a good-faith report that other public employees violated the law. Plaintiff made a report to the appropriate chain of command at the DPD. As a direct result thereof, inter alia Major Porter was retaliated against, terminated, and suffered the adverse personnel action.

103. As a direct result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

## D. Abuse of Process

104. Plaintiff incorporates herein paragraphs 1 thru 103 above.

105. The following cases are supportive of Plaintiff's Abuse of Process claim. Williams v. City of Dallas, 53 S.W.3d 780 (Tex. App.—Dallas 2001, no pet.); Martinez v. English, 267 S.W.3d 521, 528-29 (Tex.App.—Austin 2008, pet. denied); RRR Farms, Ltd. v. American Horse Prot. Ass'n, 957 S.W.2d 121, 133-34 (Tex.App.—Houston [14th Dist.] 1997 pet. denied); Detenbeck v. Koester, 886 S.W.2d 477 (Tex.App.—Houston [1st Dist.] 1994, no writ); Snyder v. Byrne, 770 S.W.2d 65 (Tex.App.—Corpus Christi 1989, no writ).

106. The investigation and the hearing that Chief Hall conducted were valid processes. However, Defendants perverted the process when they used both processes as a means to terminate the Plaintiff. Plaintiff was in competition with certain individuals, including then-Lt. Igo and other commanders of the DPD, for a position on Chief Hall's newly reduced command staff. In spite of her being black and a woman, Chief Hall used the process to

ultimately terminate the Plaintiff. Chief Hall was seeking favor from her superiors for firing a Black woman. Because then-Lt. Igo was badly conflicted when appointed by Chief Hall to conduct the administrative investigation of Major Porter, then-Lt. Igo was only interested in eliminating competition for a command staff position. He badly abused the process of his investigation of Major Porter by making untruthful statements to the Civil Service Board and perverted the process by only interviewing witnesses favorable to his ultimate findings. Plaintiff suffered injury as a result of the improper use of process.

107. As a direct, result of the misconduct of Chief Hall and then-Lt. Igo, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**E. Intentional Infliction of Emotional Distress**

108. Plaintiff incorporates herein paragraphs 1 thru 107 above.

109. Plaintiff asserts her claim of intentional infliction of emotional distress, because they fall within the Texas Torts Claims Act ("the Act") waiver of sovereign immunity. *See* Tex. Civ. Prac. & Rem. Code § 101.001 *et seq*. The Act applies to a municipality which has waived its sovereign immunity and is, therefore, liable under this chapter for damages arising from its governmental functions, which are those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public, including but not limited to: (1) police and fire protection and control.

110. Chief Hall had a duty and responsibility as the DPD Chief of Police to know and adhere to the general tenets of employment law, the policies, the procedures, and the processes of the City of Dallas and the DPD. Chief Hall's willful and reckless unfamiliarity with

the aforementioned led to the wrongful termination of Major Porter and caused suffered damages to Major Porter.

111. Chief Pughes, Chief Hall's second in command, a tenured command staff member and nearly thirty-year veteran of the DPD, breached his duty as the commanding Chief of the Internal Affairs Division when he intentionally, reckless, and improperly advised Chief Hall about the Internal Affairs Division investigatory process and allowed the lead investigator to continuously violate City and Departmental policies, procedures, and processes throughout the administrative investigation of Major Porter which caused her to suffer damages.

112. On or about October 12, 2017, approximately one and half months after Chief Hall started her new appointment as the Chief of Police in Dallas, Chief Hall announced that all command staff members must interview for a limited number of positions on her new command staff, drastically reducing the number of chiefs by more than half. Chief Hall recklessly created a hostile work environment among command staff members.

113. Plaintiff was in competition with certain individuals including other commanders of the DPD, for a position on Chief Hall's newly and substantially reduced command staff. Plaintiff's competition included Lt. Alanis, the initiator of the sham administrative investigation and then-Chief Stokes who approved the sham administrative investigation, and then-Lt. Igo who conducted the sham administrative investigation.

114. On or about October 2017, Major Porter was the Acting Deputy Chief at the North Central Patrol Division when she received an order through then-Chief Stokes from Chief Hall to investigate citizens' complaints regarding slow response times to calls at the North Central Patrol Division.

115. On or about October 20, 2017, Major Porter e-mailed Chiefs Hall and Stokes directly with the results of her administrative investigation into these complaints. Major Porter's findings uncovered a historical and on-going culture of corruption at the North Central Patrol Division, including the supervisors' indifference towards work and a lack of accountability measures. Major Porter provided her analysis of the problem and proposed accountability measures to solve the problems in her e-mailed response to Chief Hall and then-Chief Stokes. Chief Hall intentionally did not respond, which was corroborated during the termination hearing of Major Porter on November 1, 2018, when Chief Hall stated that she read Major Porter's e-mails even though she did not respond.

116. On October 24, 2017, Major Porter interviewed with an outside panel for Chief Hall's newly reduced command staff. Chiefs Hall and Pughes were present during the interview.

117. Soon after Major Porter interviewed, it was a common conversation and belief throughout the DPD and the community that Major Porter secured a position as a Chief. As the youngest and fastest rising executive in the modern history of the DPD, this caused a groundswell of hostility and animosity amongst several of Major Porter's colleagues making Major Porter a target. Traditionally, the DPD command staff members had an average of twenty years or more with the DPD and the average age was fifty-years-old prior to an appointment to an executive rank within the DPD. Major Porter was thirty-five-years-old with thirteen years with the DPD. Such an appointment was unprecedented.

118. On November 7, 2017, Major Porter initiated a hostile work environment complaint after receiving a complaint from one of her subordinates, who was an African-American female. The complaint identified a Caucasian male supervisor at the North Central

Patrol Division as the accused. As of November 1, 2018, no administrative investigation into the conduct of that supervisor had been completed; however, an administrative investigation was initiated, conducted, and completed against the employee who made the outcry.

119. On November 8, 2017, one day after Major Porter initiated the hostile work environment administrative investigation, an administrative investigation was initiated against Major Porter by Lt. Alanis, who was assigned to the Personnel Division and also a competitor of Major Porter. Moreover, Lt. Alanis's husband was a participant in the promotional lieutenants' exam process at this time.

120. Chief Hall was negligent in carrying out her duties as the Chief of Police when she failed to investigate the motive of then-Chief Stokes who approved the administrative investigation against Plaintiff, but failed to approve the hostile work environment investigation initiated by Plaintiff. Then-Chief Stokes had ties to the personnel at the North Central Patrol Division, where the hostile work environment complaint originated. Then-Chief Stokes was also a competitor of Plaintiff. Lt. Alanis acquired approval for the administrative investigation of Major Porter through then-Chief Stokes.

121. On or about November 8, 2017, then-Chief Stokes, then-Major Griffith, then-Lt. Igo, Lt. Alanis, and then-Lt. Alex were reckless in their actions when they circumvented the normal Internal Affairs Division investigatory process and met, discussed, and contacted RFDG clients and potential witnesses. These actions prevented Major Porter from receiving her right to due process in an administrative investigatory process.

122. On November 14, 2017, Major Porter was notified via e-mail by then-Lt. Igo that she was under administrative investigation and that he was conducting an administrative inquiry into her actions with RFDG.

123. Also, on November 14, 2017, Major Porter e-mailed Chief Hall and made an outcry regarding a retaliation complaint against Major Porter, provided a detailed timeline of events that explained the complaint, and requested Chief Hall review the administrative investigation, "quash the administrative investigation, or have an impartial third party conduct the administrative investigation." Chief Hall exhibited extreme and outrageous conduct when she breached her duty as the Chief of Police and intentionally did not respond to Major Porter's hostile work environment complaint and request to work in a safe environment free of retaliation for performing her required duties.

124. Chief Hall was grossly negligent in her duties as the Chief of Police and violated the law and the City and Departmental policies and procedures as a supervisor when she failed to investigate the validity of Major Porter's hostile work environment complaint and protect her employee, a public servant, and Major Porter suffered greatly from this breach.125. Chief Hall alone had the authority and obligation to grant Major Porter's request to have an impartial administrative investigation conducted to eliminate even the appearance of impropriety. Chief Hall knew or should have known that when she created a competition amongst the command staff that impartiality in any administrative investigations involving members of the command staff was likely to be contentious. Chief Hall intentionally breached her duty when she allowed a competitor and subordinate of Major Porter to conduct the administrative investigation that resulted in the badly biased administrative investigation that ultimately led to Major Porter's termination.

125. Chief Pughes breached his duty and exhibited extreme and outrageous conduct  as the commanding Chief over the Internal Affairs Division when he continuously

allowed the lead investigator to violate City and Departmental policies, procedures, and processes throughout the administrative investigation of Major Porter.

126. On November 17, 2017, when Major Porter arrived in the Internal Affairs Division for her first interview regarding the administrative investigation she was the subject of, then-Lt. Igo informed Major Porter that he changed the administrative investigation from an Internal Affairs administrative inquiry into an administrative investigation, which violated the Dallas Police Department's Internal Affairs Standard Operating Procedure 303.05, which states that the Internal Affairs investigator will follow the procedures outlined in 303.03 of completing the administrative inquiry prior to starting an administrative investigation.

127. Also on November 17, 2017, after Major Porter's initial interview in the Internal Affairs Division, Major Porter's involvement in a cheating scandal appeared in media including on the news, in print, and through various social media platforms. According to the Internal Affairs Division Standard Operating Procedure, administrative investigations are to remain confidential; however, during this administrative investigation that confidentiality was repeatedly breached and Major Porter's personal and professional reputation suffered greatly.

128. On November 22, 2017, Chief Watson placed Major Porter on Administrative Leave. The Internal Affairs Division had not presented Major Porter with any allegations and further violated her due process right when Major Porter was not provided a reason by Chief Watson for placing her on Administrative Leave.

129. On November 29, 2017, Chief Hall met with Major Porter in a post-promotional debriefing in Chief Hall's office, where Chief Hall informed Major Porter that she would remain a Major until the administrative investigation was complete.

130. Major Porter attempted to talk to Chief Hall during this meeting about the administrative investigation and the departmental environment since Chief Hall's arrival. Chief Hall informed Major Porter that she could not discuss the administrative investigation. The Dallas Police Departments' policy explicitly gives the Chief of Police this right to talk to any accused employee as the Chief of DPD. The refusal to discuss the investigative backdrop reflected Chief Hall's lack of knowledge regarding her duties and responsibilities as the Chief of Police during an administrative investigation.

131. The following day, November 30, 2017, despite Chief Hall's conversation with Major Porter the day before, Chief Hall violated Major Porter's due process rights and knowingly had Major Porter's name removed from the DPD's organizational chart. This act displayed Chief Hall's inability to remain neutral and was indicative of her rush to judgment in coming to an unsubstantiated conclusion about the outcome of the administrative investigation. The organizational chart, which was distributed department-wide depicted the departments commanders and their assignments. Chief Hall's actions directly caused a number of DPD's personnel to contact Major Porter regarding the removal of her name from the organizational chart causing more emotional distress. Major Porter did not appear on the DPD's organizational charts after November 30, 2017, even though the administrative investigation involving her was not completed until March 2018.

132. On or about January 24, 2018, the DPD acted with malice and violated Major Porter's due process rights when they placed four sustained allegations on Major Porter's Internal Affairs Division resumé from this administrative investigation; however, as previously stated the administrative investigation was not completed until March 2018.

133. On or about February 6, 2018, the DPD violated Major Porter's due process rights when they intentionally failed to notify Major Porter or her attorney that Major Porter would be the subject of the administrative investigation and the DPD acted with malice when they isolated Major Porter and publicly discussed the administrative investigation of Major Porter prior to its' completion. Then-Lt. Igo and then-Chief Walton intentionally made false and misleading statements during this publicly recorded City of Dallas Civil Service hearing about Major Porter and RFDG causing emotional distress. Then- Lt. Igo stated that he didn't speak to the twelve RFDG sergeant candidate clients and then admitted after being questioned by the panel he was able to speak to all twelve. Then-Lt. Igo misrepresented the testimony of several of the twelve sergeant candidates in the report of his administrative investigation. Then-Chief Walton informed the panel that the Internal Affairs Division findings were made based on a preponderance of evidence; however, the preponderance of evidence was in Major Porter's favor. On November 17, 2017 Major Porter provided then-Lt. Igo video evidence disproving his claims in the hearing.

134. After the hearing, Major Porter was "trolled" (harassed) on her DPD Twitter account, which she de-activated as a result.

135. "Garrity" helps to ensure employees constitutional rights and the preserve the investigatory process. Major Porter was silenced under "Garrity" while she and her business were slandered in the media by the intentional defamatory statements made by the DPD in the televised hearing.

136. It is evident that Chief Hall made a pre-judgement of fact about Major Porter's case and found her guilty without due process, when on or about February 20, 2018, Chief Hall intentionally made an inflammatory announcement in the DPD's Personnel Division

that Major Porter was responsible for the need of the sergeant candidates to retake the sergeants'
assessment center; however, the administrative investigation was not complete until the
following month, but regardless Chief Hall publicly defamed Major Porter. As a direct result of
Chief Hall's extreme and outrageous conduct, lack of discretion, and her defamatory statements,
Major Porter received a number of calls from concerned employees within the DPD regarding
Chief Hall's statements and her reputation suffered.

137. Chief Pughes breached his duty as the commanding officer over the Internal
Affairs Division when he approved then-Lt. Igo's badly biased incomplete administrative
investigation. Then-Lt. Igo swayed the administrative investigation by omitting material
witnesses. Then-Lt. Igo failed to interview lieutenant candidates that participated with RFDG. In
addition, then-Chief Stokes, who approved Major Porter's "Outside Employment" was never
interviewed. These inactions violated Major Porter's due process right.

138. Chief Watson knowingly made damaging false statements in the
administrative investigation of Major Porter and was proven to be untruthful and no action was
taken.

139. In October 2018, Major Porter e-mailed her rebuttal of the administrative
investigation to Chief Hall and other command staff members detailing the inconsistencies
throughout the administrative investigation, the fact that the preponderance of evidence weighed
heavily in Major Porter's favor, and the fact that then-Lt. Igo made egregious investigatory errors
and intentionally made false and misleading statements throughout the administrative
investigation. The Internal Affairs Division investigators appeared to cherry pick how they
obtained information from witness to witness. Some witnesses were instructed to write internal

statements. Some witnesses were not. No command staff members other than Major Porter were audio recorded.

140. The Dallas Police Department General Orders 501.00 (C) also states "accordingly, the Chief of Police must ensure that internal administrative investigations are conducted in accordance with the fundamental principles of fairness and that Department members are afforded their rights. This can only be accomplished through a consistently thorough investigative process."

141. On November 1, 2018, Major Porter presented, in person, to Chief Hall and other commanders her rebuttal as well as additional exonerating documents, which Chief Hall intentionally ignored.

142. Also, on November 1, 2018, during the discipline hearing Chief Hall intentionally stopped Major Porter as she presented exonerating evidence and stated, "that's not what they told me." According to Chief Hall's statement made during a State of Texas Administrative Hearing on October 8, 2019, Chief Hall admitted under oath that she did not read the entire administrative investigation involving Major Porter prior to terminating her employment, a circumstance which demonstrated her maleficence in her capacity as the Chief Police and her lack of attentiveness to fulfilling her professional obligations.

143. Chief Hall was negligent in her duties when she failed to provide due process to Major Porter when she abruptly interrupted Major Porter as she presented this exonerating evidence and stopped the hearing, informed Major Porter that she was terminated, and motioned for the DPD personnel to escort Major Porter out of the hearing.

144. Chief Hall shirked her duty as Chief of Police and exhibited extreme and outrageous conduct as a commanding public safety authority when she failed to investigate

Major Porter's hostile work environment complaint, failed to have the hostile work environment investigation initiated by Major Porter conducted, and failed to have a thorough and impartial administrative investigation of Major Porter conducted by a neutral third investigative entity as she requested.

145. Chief Hall neglected her duty as the Chief of Police when she exhibited extreme and outrageous conduct when she failed to discipline then-Lt. Igo for his proven and demonstrated adverse conduct during the administrative investigation of Major Porter and promoted then-Lt. Igo and his wife within six months of Major Porter's termination.

146. Chief Hall also neglected her responsibility as the Chief of Police when she failed to discipline Chief Watson for being untruthful during an Internal Affairs administrative investigation. Chief Watson's original written false statement helped to set the conclusory direction of guilt for the administrative investigation. Chief Watson was allowed to maintain his position as a Deputy Chief of Police and was not disciplined for his adverse conduct during the investigatory process of Major Porter.

147. As a commanding officer Major Porter performed her duty and fulfilled her obligation as a public servant all while audaciously and boldly ascending through the ranks of the police department while seeming to violate sacrosanct department traditions steeped in seniority.

148. Major Porter was retaliated against and Major Porter suffered greatly from the highly-publicized, slanderous statements made by the DPD's executive staff and personnel about her and her business. The disparaging statements made by the DPD regarding Major Porter's character discredited her name and caused and continues to cause her emotional distress.

149. The sham administrative investigation, defamatory statements, and wrongful termination irreparably impugned Major Porter's character, reputation, and business status. The DPD's slanderous accusations against Major Porter and RFDG were publicized nationwide on the news, in print, and through various social media outlets.

150. Major Porter suffered from then-Lt. Igo's badly biased administrative investigation, the slanderous allegations made by the DPD during the publicly televised City of Dallas Civil Service hearing, and by the verbal and written statements made by Chief Hall before and after Major Porter's termination. The egregious nature of Chief Hall's reckless disregard for her duties as the Chief of Police in ensuring that Major Porter was afforded her due process rights, was free of retaliation in the workplace, and received a fair and impartial administrative investigation resulted in the wrongful termination of Major Porter. Chief Hall's reckless disregard for her duties were the causal factors of Major Porter's inability to secure employment elsewhere and resulted in emotional distress.

151. Chief Hall and then-Lt. Igo intended to and did inflict upon Major Porter severe emotional distress by abruptly ending her 15-year career and irreparably impeccable record with the City of Dallas. Chief Hall recklessly breached her duty as the Chief of Police and violated Major Porter's due process rights when she wrongfully terminated Major Porter, a whistleblower, ending Major Porter's career, causing substantial loss of income, ruining Major Porter's reputation, and distorting Major Porter's public image.

152. As a direct result of the misconduct of Chief Hall and the DPD, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**F. Negligence**

153. Plaintiff incorporates herein paragraphs 1 thru 152 above.

154. Defendants had a duty to act in a lawful way, which is not to conflate or misrepresent the facts. Plaintiff suffered damages as a direct result of the breach of duty, caused by the acts and practices of the Defendants, including Chief Hall and then-Lt. Igo as evidenced above.

155. Dallas Police Department General Orders 501.00 (A) states "the policy of the Dallas Police Department is to provide citizens with a fair and effective avenue for redress of their legitimate grievances against members of this department. At the same time, members of this department must be protected from false charges of misconduct or wrongdoing and must be provided with due process safeguards."

156. The Dallas Police Department General Orders 501.00 (C) also states "accordingly, the Chief of Police must ensure that internal administrative investigations are conducted in accordance with the fundamental principles of fairness and that Department members are afforded their rights. This can only be accomplished through a consistently thorough investigative process."

157. As the DPD Police Chief, Chief Hall had a legal duty to her employees and owed her employees a high duty of care as a public servant to fully investigate any complaints of a hostile work environment or impropriety committed by any employees under her scope. Chief Hall breached that duty when she failed to exercise ordinary care by failing to investigate Major Porter's hostile work environment retaliation complaint as a whistleblower and allowed the unethical conduct of the Internal Affairs Division to guide her decision-making regarding the sham and spurious administrative investigation of Major Porter, thus ending Major Porter's unsullied unprecedented law enforcement career.

158. Chief Hall breached her legal and ethical duties inherent in her official capacity when she failed to ensure that Major Porter received a fair and impartial administrative investigation by allowing Major Porter's competitors to conduct the administrative investigation. Chief Hall failed to remain impartial when she pre-judged the outcome of the administrative investigation as is evident in her statements made in the DPD Personnel Division prior to the completion of the administrative investigation and again when Chief Hall failed to read and review the administrative investigation.

159. Chief Hall breached her duty as the Chief of Police when she denied Major Porter the opportunity to self-demote. Chief Hall at the advisement of Chief Pughes denied Major Porter's self-demotion. Consistent with the DPD's past practices, self-demotion would have provided Major Porter due process rights through the City of Dallas Civil Service. Based on knowledge and belief DPD past Chiefs of Police set precedence by allowing former commanders under administrative investigation to demote or retire. Around the time the administrative investigation was initiated against Major Porter, Chief Hall gave Ret-Chief Christina Smith, who was under administrative investigation, the option to retire. Chief Hall's. actions precluded either alternative. Major Porter suffered damages from Chief Hall's grossly negligent behavior in the orchestrated termination of Major Porter.

160. Chief Hall neglected her responsibility as the Chief of Police when she failed to read the Internal Affairs administrative investigation of Major Porter in its' entirety prior to terminating Major Porter. As a matter of professionalism, ethics, and decorum the Chief of Police is obligated to read the entire administrative investigative package and understand the relevant facts giving rise to any subsequent decision. The Chief of Police is also required by law to ensure that every employee faced with the life-altering reality of termination is entitled to the

due process right of a fair and unbiased administrative investigation, with the evidence supporting the actions taken.

161. An unbiased look at the administrative investigation of Major Porter revealed that the administrative investigation of Major Porter was fraught with disturbing inconsistencies in investigative methodology, commitment to fact-finding, and objectivity. Moreover, Chief Hall had a duty to ensure that the facts supported the findings and that any sustained allegations met the threshold of preponderance of evidence. Had Chief Hall read the entire administrative investigative package, she would have been keenly aware of the factual discrepancies and lack of evidence sufficient to supporting the purported findings. Chief Hall's failure to fulfill her duties as the Chief of Police ruined Major Porter's reputation and career.

162. Chief Hall's unconscionable breach of duty allowed unproven facts and opinions to dictate her decision-making. No DPD command staff members in Major Porter's tenure had been terminated by the Chief of Police prior to the termination of Major Porter by Chief Hall. Chief Hall denied Major Porter her due process rights when under the advisement of Chief Pughes she denied Major Porter's self-demotion request. Other at-will employees on the command staff, who were under administrative investigation, were given the option to retire or demote. Chief Hall displayed disparate treatment towards Major Porter by failing to investigate Major Porter's retaliation complaint and terminating Major Porter abruptly as Major Porter presented evidence in defense of herself as is her right as a public service employee.

163. By the conduct described herein above, Defendants were negligent and caused the damages and injuries suffered by Major Porter.

164. As a direct result of the reckless and intentional misconduct of Chief Hall and the DPD, Plaintiff has suffered damages which will be incorporated herein and set forth below.

**F. Business Disparagement**

165. Plaintiff incorporates herein paragraphs 1 thru 164 above.

166. Chief Hall and then-Lt. Igo published disparaging words about the RFDG, a limited liability company in which Plaintiff owned half an interest. The words published by the Defendants, specifically that RFDG provided confidential information to prospective sergeant candidates, were false and were published with malicious intent, because the DPD wanted to harm RFDG so that the candidates would have little or no assistance in preparing for the examination.

167. The RFDG was established in early 2017. The United States Trademark and Patent Office trademarked and copyrighted the name and logo. RFDG was working with an Intellectual Property attorney to copyright their business model when this administrative investigation began. To Major Porter's knowledge, at the time the RFDG was established, it was the only law enforcement company owned and operated by African-American females and was the only law enforcement company that offered individual promotional training.

168. In June of 2017, Major Porter submitted the required DPD document seeking approval for outside employment, that was approved by two of her supervisors in her chain of command, Chief Watson and then-Chief Stokes.

169. On November 14, 2017, the Internal Affairs Division notified Major Porter she was to report to the Internal Affairs Division on November 17, 2017 and instructed her to

bring various business documents associated with the training of DPD personnel and a client's list, including DPD lieutenant and sergeant candidates.

170. On November 17, 2017, as a result of the Internal Affairs Divisions instructions, Major Porter provided the requested documentation and was forced to share RFDG's business model with the Internal Affairs Division. Had Major Porter not shared the information requested, she was subject to disciplinary actions up to an including termination immediately for insubordination. Major Porter also provided video evidence of the RFDG lieutenant and sergeant clients.

171. The RFDG trained its first set of clients for the DPD lieutenants' assessment center between June and September of 2017.

172. Two of the RFDG's first set of clients ranked in the top 10 on the final DPD lieutenant's list. One of the two clients was recently promoted and is currently a Major with the DPD.

173. Also, on November 17, 2017, after Major Porter's first appearance in the Internal Affairs Division wherein she addressed the administrative investigation, media outlets began reporting that she was involved in a cheating scandal with her business, the RFDG. According to Departmental policy, administrative investigations are to remain confidential; however, in this administrative investigation that confidentiality was consistently breached and RFDG's business interests suffered greatly.

174. Within five days after appearing in the Internal Affairs Division and providing the RFDG business model, Major Porter was placed on Administrative Leave, without the DPD providing a reason. While on Administrative Leave, Major Porter was not allowed to participate with RFDG. Major Porter was on Administrative Leave for almost a year until her

termination; during this time Major Porter was unable to perform work with the RFDG. The DPD was aware that RFDG was a newly formed company and only comprised of two people, including Major Porter. The DPD intentionally halted the business of RFDG by precluding Major Porter's ability to participate in any aspects of the business operations of RFDG, including marketing.

175. Shortly after Major Porter released the RFDG business model to the Internal Affairs Division in November of 2017, other police training companies started offering training that mirrored RFDG's business model.

176. On February 8, 2018, during the City of Dallas Civil Service hearing the DPD disparaged the RFDG when the departments representatives maliciously made false and misleading statements about the RFDG. The City of Dallas Civil Service hearing was publicly televised. The DPD Internal Affairs Division intentionally provided false information to the City of Dallas Civil Service board and the public to make them believe that DPD had evidence to support its statements by a preponderance of evidence. The DPD Internal Affairs Division intentionally omitted exonerating and exculpatory video evidence during the City of Dallas Civil Service hearing and intentionally slandered the reputation of RFDG.

177. From November 2017 to the present, the defamatory and slanderous allegations against RFDG made by the DPD appeared in print, in the media, and through various other social media outlets derailing and damaging RFDG.

178. Chief Hall breached her duties as the Chief of Police when she caused and allowed the DPD to intentionally cause irreparable harm to RFDG. Policing is a profession rooted in tradition, integrity, and ethics. Major Porter and RFDG's presence changed and challenged the departmental cultural and promotional norms. The defamatory statements and

actions committed against Major Porter and RFDG by the DPD caused substantial reputational harm that resulted in the direct suffering of the RFDG's financial and business interests.

179. The Plaintiff pleads for special damages as well as damages in fact related to and caused by Defendants' illegal and improper conduct.

## IV. DAMAGES

180. The damages that LaToya Porter plead herein are as follows:

A. Reinstatement to her rank of Major from November 1, 2018 to present;

B. Back pay, and assuming no reinstatement, future pay;

C. Damages to Plaintiff's reputation;

D. Punitive damages, punitive because of the outrageous conduct of Chief Hall and then-Lt. Igo;

E. Lost benefits from November 1, 2018 to present;

F. An injunction against future illegal conduct;

G. Attorneys' fees;

H. the cost of expert witnesses;

I. and all other damages permitted by law.

## V. PRAYER

For the reasons here and above stated, Plaintiff asks the court to find that she has proved her claim and seeks the damages reflected above to include actual, special, and punitive damages as set forth above. Plaintiff seeks all other relief to which she is humbly entitled.

Respectfully submitted,

John W. Bickel II
Texas Bar #02292700

Bickel PLLC
3505 Milton Ave.
Dallas, TX 75205
(214) 537-8100
jwbickel@gmail.com
ATTORNEY FOR PLAINTIFF LATOYA PORTER